**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **LESLIE BALES and BRYAN BALES** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| | § | |
| **HOUSTON INDEPENDENT SCHOOL** | § | |
| **DISTRICT and RITA GRAVES in her** | § | |
| **Individual Capacity** | § | |
| | § | **JURY TRIAL** |
| | § | |
| **Defendants.** | § | |

**PLAINTIFFS' ORGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE U.S. DISTRICT JUDGE:

LESLIE BALES and BRYAN BALES, file this Original Complaint and Jury Demand against the HOUSTON INDEPENDENT SCHOOL DISTRICT (hereinafter "HISD"), and RITA GRAVES, in her individual capacity, Defendants, and in support of their claims allege the following:

**I. THE PARTIES**

1.      Plaintiffs Leslie Bales and Bryan Bales are residents of Houston, Harris County, Texas.

2.      Houston Independent School District (HISD) is a political subdivision operating under the Texas Constitution and law. HISD may be served with summons by serving its Superintendent Mike Miles at Hattie Mae White Educational Support Center, 4400 West 18th Street, Houston, Texas 77092 or wherever he may be found.

1

3.      Rita Graves is the Principal of Lamar High School, sued in her individual capacity, and may be served with summons at Lamar High School, 3325 Westheimer, Houston, Texas, or wherever she may be found.

## II. JURISDICTION AND VENUE

4.      Leslie Bales and Bryan Bales bring this lawsuit alleging that HISD and Graves violated the Plaintiffs' rights guaranteed them by the First and Fourteenth Amendments to the Constitution of the United States of America, and pursuant to 42 U.S.C. §§ 1983 and 1988, and 28 U.S.C. § 2201.

5.      This Court has jurisdiction under 28 U.S.C. § 1331 because Leslie Bales and Bryan Bales bring claims for violations of the federal Constitution and federal laws. This Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) because Leslie Bales and Bryan Bales seek to redress the deprivation of federal constitutional rights under the color of state law or custom.

6.      Venue in this Court is proper under 28 U.S.C. § 1391(b)(2) as the events giving rise to Plaintiff's claim occurred in this district and this division.

## III. FACTUAL ALLEGATIONS

7.      Plaintiffs Leslie Bales and Bryan Bales file this lawsuit to protect their First and Fourteenth Amendment rights to freedom of speech, equal protection, and due process.

8.      Leslie and Bryan Bales are a married couple.

9.      Leslie Bales is a black woman. Bryan Bales is a white male.

10.     The Bales are native Houstonians, and both graduated from public schools.

11.    The Bales have three children. Maegan Ann Bales-Cortez and Zoe Katherine Bales are their adult daughters. Both are Lamar High School graduates. Their son, Ethan James Atticus Bales, also became a Lamar graduate on June 8, 2024.

## A. MARCH 1, 2023: HOSTILITY DIRECTED AT MAEGAN BALES WITHOUT JUST CAUSE.

12.    March 1, 2023, Maegan and Zoe Bales drove to Lamar High School to have lunch with their brother Ethan. Ethan was then a Lamar HS 11th grade student.

13.    Before this visit to Lamar HS, Maegan and Zoe had taken Ethan to lunch quite a number of times and knew the protocol for checking their brother out of school to share an off-campus lunch. Maegan intended to follow that protocol. She would walk from her car to Lamar's main entrance, enter the "Welcome Center" that is just inside that entrance, and sign Ethan out at the reception desk.

14.    Upon arriving at the campus and parking, Maegan got out of the car and walked toward the Welcome Center. She saw Ethan standing outside the main entrance waiting for her.

15.    As Meagan neared Ethan, she realized she may have forgotten her driver's license. She stopped and checked, and, indeed, she had not brought her license.

16.    Immediately knowing she would be unable to sign Ethan out, Maegan figured, since she and Zoe had already stopped and bought lunch, she would get the lunch from the car and hand it to Ethan.

17.    As Maegan was walking back to the car to grab the lunch, she was approached by HISD employee Suzanne Acord. Maegan explained what she was doing and why and pointed out Ethan who was standing a few yards away from them.

18.     Maegan, then walked to the car, grabbed the lunch, walked to Ethan, handed him his lunch, hugged him, and headed back toward the car.

19.     As Maegan walked toward the car, she saw Suzanne Acord motion to an HISD police officer, Officer Craig Davis, who was sitting in a golf-cart. When Maegan was a few steps from Acord, Davis's cart shot out right in front of her—blocking her path and nearly hitting her.

20.     Davis' unnecessarily aggressive and dangerous stunt startled Maegan, and triggered a mix of emotions--shock, fear, and anger at the disrespect and danger posed by Davis' act of hostility. Maegan stood calmly as Ms. Acord disrespectfully ranted at her. Ms. Acord's tirade served no legitimate purpose. Like Davis' unnecessarily aggressive use of the HISD golf cart, Ms. Acord's rant shocked, humiliated, and frightened her, and nothing about Meagan's conduct necessitated or justified Acord's conduct.

21.     Acord's angry tirade amounted to repeatedly disclaiming that all food deliveries needed to be made at the east side of the campus. Maegan attempted to politely explain the particular circumstances of her visit and assure Acord and Davis that she had no intention of defying the rules then or in the future, but Acord spoke over Maegan repeatedly raging that all food deliveries needed to be made on the eastside. Maegan calmly endured Acord's rant. Maegan consciously was determined not to say or do anything that might trigger an escalation of Davis' or Acord's hostility. Davis had nearly run into Maegan with a golf cart and weapon. Acord in words, tone, and volume expressed a hostility completely disconnected with the events and public setting. Maegan felt physically threatened and deeply humiliated.

22.     When Acord's rant appeared close to an end, Maegan carefully walked around Davis and his cart, returned to her car, and she and Zoe drove away.

23.     Shaken by the whole experience and the intensity of Davis' and Acord's hostility, Maegan called her parents to let them know what had happened. She was concerned that Ethan may suffer repercussions.

**B. MARCH 1, 2023, HISD HARASSMENT OF LESLIE AND BRYAN BALES, LAMAR HS PARENTS.**

24.     After receiving Maegan's call, Leslie Bales and Bryan Bales drove to Lamar for the purpose of speaking with or making an appointment to speak with an Administrator to voice their concern about the way Maegan, their 26-year-old daughter, had been treated by HISD employees.

25.     HISD policy FNG (LOCAL), as written, expressly encourages just this type of meeting to resolve or reasonably attempt to resolve disputes as soon as possible. The policy reads as follows:

> The Board encourages students and parents to discuss their concerns with the appropriate teacher, principal, or other campus administrator who has the authority to address the concerns.
>
> Concerns should be expressed as soon as possible to allow early resolution at the lowest possible administrative level.
>
> Informal resolution shall be encouraged, but shall not extend any deadlines in this policy, except by mutual written consent.

EX 1 at P. 2 Guiding Principles.

26.     HISD and Graves, the school Principal, however, in practice, as the Bales learned, do not encourage complaint resolution. Instead, HISD practices, including its grievance procedure practices as actually implemented, discourage voicing complaints about HISD misconduct by intimidating, humiliating, and punishing those who dare to complain.

27.     When arriving at the Lamar HS, Leslie Bales and Bryan Bales parked and walked toward the Welcome Center.

5

28.    As Leslie and Bryan reached the main entrance, they were aware that Acord and at least two armed police officers were following behind them and shouting. Their shouts were loud but incoherent, and impossible to hear because of the amount and volume of communication noise coming from the officers' radios.

29.    The Bales now know, from documents in the Defendants possession, that Graves knew the Bales had arrived on campus to make a complaint before the Bales reached the Welcome Center. An Acord email reads that as the Bales walked toward the Welcome Center "[t]hat is when I [Acord] called you [Graves]." EX. 2.

30.    The Bales walked into the Welcome Center together and went to the reception desk to sign in. They asked to meet with an Administrator to complain about the conduct of Acord and Davis toward Maegan.

31.    The Welcome Center, however, had become a center of hostility as that is exactly what confronted the Bales. The Bales had made prior visits to the center without incident. The difference March 1, 2022, was the campus staff had been alerted that the Bales were visiting to make a complaint.

32.    Even the routine sign in process was infected with hostility.

33.    Before the Bales reached the Welcome Center entry, Antrice Axel, who would handle the Bales sign in, left her station, rushed excitedly to the Welcome Center doorway, and looked down the hallway in the direction from which the Bales were approaching. This is confirmed by video in the possession of HISD.

34.    Axel quickly returned to her station just before the Bales entered the Welcome Center. Axel's excited gander down the hallway was both odd and telling. It factually evidences

the staff's knowledge of and excitement about the Bales arrival to make a complaint. Axel's movements are confirmed by video in the possession of HISD. HISD and Graves claim there is no audio on the Welcome Center video, that outdoor cameras have large blind spots that fall where Davis and Acord placed themselves, and that police body cameras, to the extent they have them, do not support allegations of Bales misconduct.

36.    Leslie and Bryan walked into the Welcome Center together, and together went to the reception desk.

36.    Leslie rested her phone and keys on the reception counter, and Bryan, standing right next to her, began to sign both of them in.

37.    Before the Bales reached the reception desk, Axel had already started the process of generating their visitor passes. Axel knew the Bales and knew they were parents of a Lamar student. Axel had signed them in before when one or both of the Bales visited Lamar.

38.    Leslie told Axel that she and Bryan wanted to speak with an Administrator. Axel said that Graves, the Principal, was not on campus. The truth of Axel's statements will require discovery, but, as alleged, Graves knew the Bales were on campus before the Bales reached the Welcome Center, because Acord had called her.

39.    When told that Graves was not on campus, Leslie said that was okay, but she and Bryan did want to speak with an Administrator or set an appointment to meet with an Administrator to make a complaint.

40.    Although Axel was already handling the Bales' sign-in, Evelyn Polio, an HISD employee, suddenly popped up from her station behind Axel, ignored Leslie, and asked Bryan,

who was obviously with Leslie, if he needed help. Polio's movements are confirmed by video in the possession of HISD.

41.    Both Leslie and Bryan immediately recognized Polio's intervention for what it was, an often-used racial slight. Polio could not possibly have thought, as she clearly intended to imply, that the Bales were not a couple.

42.    The Bales, a mixed-race couple, had experienced this race-based slight often during their marriage. Though obviously a couple, the different color of their skins evokes in some, actually in way too many, the opportunity to glibly imply that they were not actually a couple.

43.    Observing and hearing Polio's needlessly race-infused intervention with what should have been a routine sign-in process, Leslie, speaking to Bryan, said, "Well that's racist." Bryan agreed.

44.    Axel, whose demeanor throughout the sign in process was noticeably excited, jumped into the Bales conversation with each other, and said in a pressured voice, "She isn't a racist."

45.    Polio's provocative, unnecessary, and race-based intervention in the routine Welcome Center sign-process was improper and reflects, among other things, the absence any of HISD diversity or conflict resolution training and supervision. Any training and supervision of organizational employees assigned to customer reception tasks would result in employees who greet visitors with courtesy and refrain from types of conduct that are widely known as racially offensive.

46.    The Bales, when confronted with racial slights, do observe,  discuss, and point out race-based insults, but never with anger or profanity. They did on this occasion point out that racist

conduct is not confined to a specific ethnicity—Mexicans can be racist as can ethnicity. Polio defensively attempted to escalate by denying she was Mexican.

47.     Directness differs from "impropriety." A person has a constitutionally protected right to speak out against race-based insults. Leslie Bales had the right to speak to her husband about Polio's racial slight, and Bryan had the right to agree. Had Polio and Axel received any diversity or conflict resolution training and supervision from HISD neither would have acted as they did or would have been disciplined for racially insensitive misconduct.

48.     Leslie Bales and Bryan Bales went to the Welcome Center, as concerned parents, seeking an audience with an Administrator. The purpose of their visit was that simple and that legitimate.  The Bales had no intention of arguing with or name-calling anyone, and most certainly did not want to engage is a dispute with the reception staff. This remained true despite Axel's and Polio's misconduct that was racially provocative whether intentionally or the result of no diversity or conflict resolution training and supervision. On information and belief that will require discovery, neither Axel nor Polio has received any counseling or training or discipline resulting from their misconduct. They were not even asked about the misconduct claimed by the Bales.

49.     After the Bales had signed-in, received their visitor passes, and waited for an audience with an Administrator, Davis, other armed school police, and multiple HISD employees paraded past them, eyed them, and monitored them as if they were somehow something other than, and less than, concerned parents who wished to express a complaint. The Bales, having experienced the ugly fact of raced-based dehumanization, knew this "special treatment" was intentional and the result of poor training and supervision, and, in this case, intended to discourage them from voicing their complaints about HISD employee misconduct. The "monitoring" misconduct was dehumanizing, demeaning, humiliating, and threatening to the Bales.

50.    Armed HISD police were among the parade of HISD employee "monitors" who sought to suppress the Bales' right to voice complaints about HISD misconduct.

51.    Davis, the officer who had nearly hit Maegan with a golf cart, was particularly notable among the parade of HISD "monitors" for his obvious intent to convey a  threat to the Bales with his bearing and disdain. Davis' over-bearing threat served no legitimate purpose when directed at parents who posed no danger and desired only to voice a complaint to an Administrator. Another armed HISD police officer threatened the Bales for no stated reason that she might arrest them. This threat was made against parents of students who wished only to express a complaint to an Administrator.

52.    Leslie and Bryan well knew that their peculiar reception March 1, 2023, was both race-based and an effort to suppress their right to voice their complaint about the misconduct of Acord and Davis.

53.    Bryan asked the HISD police why it was necessary to bring guns to bear against them. He asked the question seriously as they posed no threat to anyone's safety. He received no answer, but Davis through demeanor and carriage attempted to convey an increased aura of authority and threat. It was an overt attempt to escalate the intimidation already imposed on the Bales.

54.    Despite the rudeness, hostility, and threats directed at them by HISD employees, the Bales controlled their emotions, and Leslie even made an effort to have cordial conversations with her HISD employee "monitors."

55.    The hostility that met them was intended to discourage their right to voice their complaints, aggravated by overt racial animus.

56.     Rather than acknowledging that the Bales were parents who had every right to voice their complaints, the Bales were treated as pariahs-- unwelcome in the Welcome Center.

57.     At no time did either of the Bales use profanity or speak in a manner that differed in volume or tone from their everyday conversational speech.

58.     Before, during, and after their March 1, 2023, Lamas HS visit, Leslie and Bryan Bales consistently made every effort to set a good example for their three children, knowing that they must navigate the unique and often quite difficult challenges faced by mixed-race individuals. The need to remain respectful, while maintaining self-respect, requires a great deal of patience, dignity, and adjustment in every encounter with people who are insensitive to or hostile toward races, ethnicities, and cultures that differ from their own.

59.     The Bales had sat for quite a while in the Welcome Center before an Administrator, Mary Ellen Fernandez, arrived. Fernandez' engagement with the Bales further evidenced the absence of any HISD diversity or conflict resolution training, and HISD's intent to discourage voicing complaints about HISD.

60.     Fernandez made no effort to professionally greet the Bales, and immediately escalated the hostile environment. She made it clear in her demeanor and words that she was put out with Bales before speaking with them, had no intent or interest in talking with them, and wanted the Bales to leave without voicing any complaint.

61.     Bryan, controlling his emotions, politely but matter-of-factly told Fernandez that they should at least be given an appointment to meet with an Administrator to express their complaint.  With Davis at her side, striking his authoritarian pose, Fernandez, while remaining

inappropriately dismissive of the Bales and their concerns, reluctantly scheduled a meeting with her for the next day, March 2, 2023.

62.    The Bales thanked Fernandez, left the Welcome Center, walked back to their car, and drove home.

63.    Unknown to the Bales at the time, Fernandez and Principal Graves found time that same day, Wednesday, March 1, 2023, to start compiling "evidence" to discredit the Bales and discourage them from voicing their concerns.

64.    Graves played a central and continuing role in HISD's effort to suppress the Bales' right to express their complaint by relentlessly attacking them. As stated, Graves knew before the Bales reached the Welcome Center March 1, 2023, that these two parents of a student in her school wanted to complain about misconduct of HISD employees assigned to the campus Graves was formally assigned to oversee and delegated by HISD unlimited power to control who could and could not express complaints while on the campus and who could and could not set foot on the campus.

**C.    MARCH 2, 2023, HISD CONTINUES TO SUPPRESS THE BALES RIGHT TO SPEAK.**

65.    Thursday, March 2, 2023, the Bales went to Lamar HS for their scheduled appointment with Fernandez to voice their complaint about Acord and Davis.

66.    The Bales' right to voice their complaint was again denied. Rather than providing an opportunity for these concerned parents to express their complaints, the HISD meeting participants used the meeting to further suppress the Bales free speech rights by attacking the Bales.

67.     HISD chose to add its employee Dennis Gillispie to the meeting. The reason for his attendance was not disclosed, and factually he did nothing other than join Fernandez in bullying and threatening the Bales.

68.     Rather than permitting the Bales to voice their complaint, Fernandez brusquely began to attack Leslie and Bryan, making false claims about the Bales' behavior the previous day. Gillespie joined in Fernandez attack.

69.     Fernandez and Gillespie did not witness any of the behavior that they used to attack the Bales. Nevertheless, Fernandez and Gillespie chastised the Bales, using information that Plaintiffs allege in this Complaint is false and information the Bales have challenged as false since Fernandez and Gillispie attack their character and conduct in the March 2, 2023, meeting.

70.     The Bales were not able to say much at all during the meeting, and what they tried to say was cutoff and spoken over. The meeting was not an opportunity for the Bales to civilly speak and discuss their complaint about Acord and Davis, but was a forum for HISD through the misconduct of Fernandez and Gillispie to prevent the Bales from expressing their complaint and attempt to chill the Bales exercise of their right to free speech with a demonstration of HISD's considerable authority to create its own narrative that belittled and threatened the Bales with damage to their reputation and even the prospect of criminal charges. Graves knew of the meeting beforehand and provided Fernandez and Gillespie with false information they used to attack the Bales during the meeting.

71.     Fernandez harshly interrogated the Bales about a video of Acord that Fernandez accused the Bales of planning to misuse in some manner. As Leslie sought to respond, Fernandez spoke over her. Realizing Fernandez and Gillespie would not listen, Leslie offered to show the

"video" to Fernandez and tried to explain that she took a brief shot of Acord so that she could identify for HISD the woman who they wished to complain about. Fernandez, however, refused to even look at the video. Instead, Fernandez and Gillespie continued the attack, repeatedly insisting that any issue the Bales may have with HISD employee conduct was the result of the Bales' behavior.

72.    The Bales tried to express *their* complaint about the unnecessarily aggressive and threatening behavior of Acord and Davis toward their daughter. They wished and tried to describe the context of their daughter's visit to the campus and the interaction she had with Acord and Davis. They hoped to learn whether HISD condoned such over-the-top hostility, and whether HISD might see fit to at least investigate whether Acord and Davis could have handled their interaction with Maegan without threat and anger. The Bales hoped to learn whether Acord and Davis understand or cared to understand that Maegan meant no disrespect to the rules or to anyone and her actions and words were those of compliance rather than defiance. Fernandez and Gillispie refused to listen and silenced the Bales by talking over and down to them. The manner in which Fernandez and Gillispie conducted the March 2, 2023, meeting further evidenced HISD's failure provide any diversity or conflict resolution training and supervision of its employees. It also evidenced HISD's practice of "conflict resolution," which is the suppression of free speech. This belies HISD's written policy that on paper, but not in practice, encourages exactly what the Bales did—express complaints promptly to a person with authority to address such complaints.

73.    The Bales wished only to voice their complaint that nothing they were aware of explained or excused the level of hostility and threat visited on Maegan by Acord and Davis. HISD's practice of "complaint resolution" is to suppress complaints and attack those who seek to voice complaints.

14

74.    The Bales hoped to speak and be heard that Maegan and her sister drove to the school as they had often done to sign Ethan out for lunch. While going to the Welcome Center, Maegan realized she had forgotten her ID and knew Ethan could not be signed out. Since she and Zoe had bought Ethan's lunch, Meagan wanted Ethan to have it. So, she grabbed the lunch from her car, handed it to her brother, hugged him, and was walking back to her car when Davis recklessly. aggressively, unnecessarily, and dangerously drove his golf cart directly in her path—nearly hitting her, and Acord ranted senselessly. Despite this Maegan was polite, acknowledged she understood, and simply wanted to get away from them. This was and is the Bales understanding of Maegan's encounter, and, if accurate, merited their complaint and the serious attention of HISD.

75.    Fernandez and Gillespie, however, refused to allow the Bales to voice these complaints.  Instead, Fernandez and Gillespie replicated the Acord and Davis misconduct. They attacked with vigor and did not listen at all.

76.    Leslie and Bryan, like their daughter Maegan, had no issue with the food delivery rules. The Bales complaint was about Acord's and Davis' unnecessary and threatening and dangerous aggression.  Rather than allow the Bales to say this, Fernandez and Gillispie escalated the matter by directing their own unnecessary and threatening aggression at the Bales.

77.    Realizing that neither Fernandez nor Gillispie would allow them to speak, Bryan suggested that it would be best to end the meeting. Fernandez threatened to bar them both from the campus.

78.     Given Fernandez' campus bar threat, Bryan insisted that Fernandez and Gillispie allow him to explain that he and Leslie banked at the bank *located on the campus*, and each Friday

they parked in the visitor lot, because parking was not available on the Eastside, and walked to the bank.

79.    Bryan sought to make sure that this banking practice was not misinterpreted as defiance.

80.    The Bales excused themselves, and left without insulting, demeaning, or humiliating their HISD attackers.

**D.    MARCH 3, 2023, HISD SUPPRESSION OF THE BALES' CONSTITUTIONAL RIGHTS ESCALATED.**

81.    Friday, March 3, 2023, the Bales went to their bank as they routinely did every Friday, and just as they had described the day before to Fernandez and Gillespie.

82.    As the Bales, having completed their weekly banking business, were walking back to their car, a golf-cart suddenly came up behind them. If the Bales had not instinctively moved aside, the cart would have hit them. As it was, the cart barely missed striking them. Davis was driving the cart. The Bales have learned that Davis has driven his cart at students on more than one occasion—HISD and Graves have done nothing to stop this childish and dangerous behavior.

83.    Until the Bales attempted to voice their complaints about Acord's and Davis' conduct on March 1 and 2, 2023, HISD employees never objected or reacted at all as the Bales walked together each Friday to do their banking business.

84.    After his cart narrowly missed hitting the Bales, Davis sped past them as if nothing had happened.

85.    When the Bales neared the parking lot, they saw Davis, sitting in the cart, glaring at them.

86.     The Bales did nothing to provoke Davis' conduct that has no other "justification" than intimidating the Bales who Davis knew wished to complain about him. The notion that Davis was somehow protecting anyone from a threat of danger posed by the Bales as they walked to and from their bank that is located on the school campus is factually unsupported nonsense.

87.     Despite Davis' behavior on March 3, 2023, the Bales walked past Davis, got in their car, and left.

88.     Davis, who had almost hit the Bales with his recklessly driven golf cart, sat in the cart staring at the Bales until they drove out. His entire demeanor-from the expression on his face to the way he postured himself in the cart-reflected anger and menace.  This was the same demeanor he used to senselessly threaten Maegan Bales and her parents' two days earlier.

**E. MARCH 8, 2023, LESLIE BALES' CONSTITUTIONAL RIGHTS WERE VIOLATED BY HISD'S CRIMINAL TRESPASS NOTICE.**

89.     Monday, March 6, 2023, HISD issued a CRIMINAL TRESPASS WARNING NOTICE to Leslie Bales. EX 3. Leslie is a Black Woman. Her husband Bryan Bales, a White Male, was not issued such a document despite engaging in conduct exactly the same as his wife. Nothing other than disparate race-based treatment can explain this fact.

90.     The document was signed by Graves.

**F. HISD'S PRACTICES RELATED TO ISSUING A  CRIMINAL TRESPASS WARNING AND  AFFORDING AN APPEAL OF SUCH ISSUANCE  BOTH (1) CONFLICT WITH HISD WRITTEN  POLICY  AND  (2)  THOSE  PRACTICES  VIOLATED CONSTITUTIONAL FREE SPEECH AND DUE PROCESS RIGHTS OF THE BALES.**

**1. The HISD practice of issuing a Criminal Trespass Warning Notice conflicts with HISD written policy.**

91.    The Criminal Trespass Warning Notice by its express language was based on HISD Board policy GKA (Local) under which Graves, as a school principal, was "authorized to refuse entry onto school grounds to persons who do not have legitimate business at the school and to request an unauthorized person or persons engaging in unacceptable conduct to leave the school grounds." EX. 3 Graves expression of authority and EX 4 GKA (LOCAL).

92.    HISD expressed policy does not mention a Criminal Trespass Warning Notice. Instead, it addresses two differing actions: (1) "Refusing entry" to a person, and (2) requesting that a person "leave the school grounds." EX. 3 Graves expression of authority and EX 4 GKA (LOCAL). Only the first action, "refusing entry," even arguably corresponds with the HISD practice of issuing a Criminal Trespass Warning Notice like that imposed by Graves and HISD on Leslie Bales. The Criminal Trespass Warning Notice issued Leslie Bales "refuses entry" prospectively. It does not "request [her] to leave school grounds." EX 3.

93.    The "refusing entry" provision, as quoted in the Criminal Trespass Warning Notice itself, applies only to "persons who do not have legitimate business at the school." Yet, HISD has never claimed that Leslie Bales did not have legitimate business at the school to voice a complaint about HISD misconduct.

94.    The Bales, like all parents of HISD students, have the right to go to the Welcome Center to voice complaints about the conduct of HISD employees. March 1, 2023, the Bales had legitimate business at the school. HISD does not contest this. Therefore, the "refusing entry" provision of the HISD written policy conflicts with its actual practice.

95.     As the "refusing entry" provision of the HISD written policy is the only support for a Criminal Trespass Warning Notice, the notice sent Leslie Bales conflicts with HISD written policy.

96.     Factually, the HISD practice of issuing a Criminal Trespass Warning Notice as sent to Leslie Bales conflicts with HISD written policy.

97.     In practice, HISD arbitrarily, capriciously, and selectively uses the Criminal Trespass Warning Notice to suppress an individual's right to complain about HISD conduct. It did so in the case of Leslie Bales.  She was on campus for legitimate business but was nevertheless prospectively "refused entry."  HISD policymakers, including the HISD Board, which is HISD's chief policy maker, ratified and participated in this practice as evidenced by the facts alleged in this Complaint. On information and belief, the practice of using threats of trespass and actual criminal charges of trespass to suppress complaints about HISD conduct is widespread as discovery in this case will establish.

**2. HISD failed to explain the appeal process or even have such a process.**

98.     HISD policy GKA (LOCAL) provides that HISD "shall . . . provide a person refused entry . . .  written information explaining the right to appeal such refusal of entry . . . under the district's grievance process." The Criminal Trespass Warning Notice did not provide this information.

**3. HISD practices deny a recipient of a Criminal Trespass Warning Notice the right to present an appeal to the Board within 90 days.**

99.     HISD policy GKA (LOCAL) provides that a person appealing denial of entry . . . shall be permitted to address the Board in person within 90 days of filing the initial complaint,

unless the complaint is resolved before the board considers it."  EX 4. HISD denied the Bales that right.

100.    HISD policy FNG local, moreover, provides that "Complaints to appeal refusal of entry to or ejection from district property based on Education Code 37.105 shall be filed in accordance with this policy. However, the timelines shall be adjusted as necessary to permit the complainant to address the Board in person within 90 days of filing the initial complaint, unless the complaint is resolved before the Board considers it." EX. 1.

101.    In practice, however, HISD denies this right of appeal, and delays appeals to unconstitutionally suppress free speech and deny due process. In this matter, the Bales' right to have their appeal heard by the Board within 90 day was deliberately delayed by HISD for more than 13 months. This practice of delay was ratified by the Board in this case, and the Board directly participated in the delay.

102.    Thursday March 23, 2023, the Bales hand-delivered their Level 1 Grievance to Graves. Although the Bales had scheduled an appointment with Graves beforehand to deliver their Initial Grievance.  Graves, accompanied by an armed HISD police officer, met them at the Lamar Main Entrance lobby, further escalating HISD's unreasonable hostility toward these  parents of a student attending that school. The Bales posed no safety danger. They came to the school by appointment. They explained the purpose of their visit when scheduling the appointment. The purpose was clearly legitimate. Yet, Graves and an HISD police officer received them with a public display of force and hostility. Graves spoke to Bryan Bales while refusing to acknowledge the presence of Leslie Bales. The HISD's fire-armed and menacing presence was unnecessary. Graves' and HISD's staging of the receipt a grievance as if it required a public display of force

was uncalled for. These parents did nothing to merit Defendants' condescension and public humiliation.

103.    This immature and unconstitutional conduct by Graves' and HISD factually support Defendants' use of the HISD grievance procedures, as implemented, as tools to suppress speech critical of HISD rather than an opportunity to resolve disputed issues quickly and fairly.

104.    As alleged, HISD written policy falsely assured the Bales that timelines would be adjusted as necessary to permit them to address the Board in person within 90 days of their March 23, 2023, filing.

105.    Instead, HISD delayed the promised Board appearance for more than a year.

106.    March 29, 2023, HISD advised the Bales that the Initial Grievance would be investigated by the Professional Standards Department (PSD). The Bales were asked to inform HISD whether or not they wished to put the grievance on hold for that investigation.

107.    March 30, 2023, the Bales responded to HISD in writing that they wanted the grievance to move. They opposed the delay.

108.    April 11, 2023, the Level 1 hearing on the Initial Grievance was held, and the decision-maker, over objection by the Bales, was Graves. Graves, therefore, sat in judgment on the merit of her own conduct. EX. 5.

109.    April 20, 2023, Graves rendered her Level 1 decision on the Initial Grievance and validated all HISD conduct.

110.    April 24, 2023, 4 days after Graves Level 1 decision on the Initial Grievance, the Bales delivered their appeal notice.

111.    April 24, 2023, Leslie Bales and Bryan Bales filed a Retaliation Grievance based on HISD's disciplinary action taken against their son fewer than 3 school days after the Bales' Initial Grievance was filed.

112.    April 27, 2023, a hearing on the Level 1 Retaliation Grievance was held, Graves again, over objection, was decision-maker.

113.    May 4, 2023, Graves issued her Level 1 decision on the Retaliation Grievance. It also validated all HISD misconduct. EX. 6.

114.    May 11, 2023, the Bales appealed the Level 1 Retaliation Grievance.

115.    May 11, 2023, HISD advised the Bales that the Level 2 Grievance hearing on the Initial Grievance would be held May 24, 2023, and the hearing officer would be Delesa Franklin,

116.    May 18, 2023, HISD unilaterally cancelled the scheduled May 24, 2023, Level 2 hearing.

117.    May 24, 2023, HISD advised that the Level 2 Initial Grievance hearing that it cancelled was reset for June 5, 2023, and the assigned hearing officer was Nirmol H. Lim.

118.    May 26, 2023, an HISD employee affiliated with the Professional Standards Department ("PSD") interviewed the Bales. She said the interview was related to the Retaliation Grievance. This person stunningly admitted that she had no knowledge of the Initial Grievance or of any Professional Standards Department investigation related to that Initial Grievance.

119.    May 26, 2023, HISD unilaterally cancelled the Level 2 hearing on the Initial Grievance that it had just reset. This time HISD unilaterally proclaimed the Level 2 hearing on the Initial Grievance would be postponed indefinitely.

120.    Moreover, HISD declared by fiat that the Level 2 hearings on both the Initial and Retaliation Grievances would also be indefinitely postponed.

121.    Factually, delay was the primary, if not sole, motivation for HISD's cancellation and indefinite postponement of the Level 2 hearings. HISD's claimed need for a thorough review of the *Retaliation Grievance* by the PSD *was* a pretext for delay.  This is factually supported by:

A.  The timing of HISD's halting of the grievance process indefinitely. HISD stopped the grievance process on both the Initial and Retaliation Grievances (1) after both the Initial and Retaliation Grievances had been filed, (2) heard and decided at Level 1, (3) promptly appealed the Bales, and (4) HISD twice committed to specific dates for the Level 2 hearings.

B.  HISD's falsely claimed months earlier, on March 29, 2023, that the Professional Standards Department was investigating the Initial Grievance.

C.  The HISD Professional Standards Department never conducted the investigation of the *Initial Grievance* as it claimed it had March 29, 2023.

D.  May 26, 2023, the Professional Standards Department investigator assigned to investigate the *Retaliation Grievance* admitted she had no knowledge of the *Initial Grievance*. She saw no evidence that her department had investigated the *Initial Grievance* at all.

E.  The content of Professional Standards Department's August 4, 2023, "investigation" report of the *Retaliation Grievance* [EX. 7] evidences that this so-called investigation was a pretext for delay. This is factually supported by the following:

   i.  The report accepts as true, without any question, the content of HISD employees' "statements" most of which had been taken long before HISD canceled, for a second time, the

Level 2 appeal hearing and halted the grievance process indefinitely. The report is fraught with objective errors so significant that it undermines any semblance of the report's objectivity and reliability. By way of example, the report assumes without any basis for doing so that the photo Accord took of Ethan was in the Welcome Center March 1, 2023and related to the events leading to the Bales' initial grievance and declaims that Polio and Axel did not see Acord take the photo at that time. EX 7 at pp 2-3. They would not have, of course, because that is not when the photo was taken. Nathan was not Acord were in the Welcome Center at that time. The report also claims that Axel reported that March I, 2023, Davis "escorted Mr. and Ms. Bales off campus because Ms. Bales was yelling profanity." Ex 7 at p. 8. This is false. The Bales were never escorted off campus Davis or anyone else.  Either Axel did not tell the truth to the investigator, or the investigator filed a false report. The investigator reported that Fernandez did not have contact with the Bales on March 1.  Ex 7 at p. 8. This is false. Fernandez did meet with the Bales March 1, and scheduled a meeting for the next day. Fernandez did not tell the truth to the investigator, or the investigator filed a false report. These are merely examples of the many objective errors that define the PSD "investigation" and render it a farcically unreliable. Yet at no stage in the grievance process did anyone HISD employee, including any Board members, find the slightest problem with this report. They relied on it and used it to ratify HISD misconduct without question or qualm- knowingly or deliberately indifferent to the reports glaring and material mistakes.

       ii. Despite the absence of evidence that any PSD "investigation" worthy of the term investigation actually took place, HISD's Professional Standards Department's alleged "investigation" delayed the grievance process from May 26, 2023, to October 13, 2023—almost six months.

iii.  The "result" of the PSD alleged "investigation" of the *Retaliation Grievance,* as reported by the PSD, was a perfunctory "conclusion" that Bales allegations of "discrimination and retaliation by Suzanne Acord . . . and Rita Graves. . . were not substantiated." This conclusion was conveyed to the Bales August 8, 2023, in a one-page letter that offered no facts or reasoning to support its conclusion or even support that any investigation took place.  EX. 8.

122.    October 13, 2023, the Level 2 hearing on the consolidated grievances was finally held.

123.    Level 2 hearings in HISD's written policy are Superintendent level hearings. While a deputy superintendent was assigned to and attended the October 13, 2023, hearing, the decision was delayed until November 8, 2023*, and a hearing officer*—not the deputy superintendent—issued a "decision" that upheld without exception all HISD conduct related to *the Initial Grievance.* Ex. 9. Inexplicably, *the Retaliation Grievance*, which was the pretext claimed for delaying the Level 2 hearing for six months, was not addressed at all by the hearing officer. Further, HISD offered no explanation for why a "hearing officer," rather than the assigned decision-maker, a deputy superintendent, did not author or approve the decision. EX. 7.

124.    November 17, 2023, the Bales appealed the Level 2 decision on the Initial Grievance and appealed HISD's failure to deliver any  decision on the Level 2 Retaliation Grievance.

125.    By letter dated March 28, 2024, more than four months after the Bales filed their appeal, and more than one year after the Bales hand-delivered their  Initial Grievance to Graves, HISD sent out a notice that a Board Level Hearing was scheduled for Thursday, April 11, 2024, at

2 PM. As alleged, HISD written policy expressly provided that the Board should have provided this hearing within 90 days of the Bales hand delivered Initial Grievance.

126.    Further delaying the Bales right to a Board appearance, by email dated April 3, 2023, HISD unilaterally cancelled the Board Level hearing that it had  scheduled for April 11, 2024,  with no explanation.

127.    May 9, 2024, the Board Level hearing was finally held. This was 13 months—**not 90 days** after the Bales hand-delivered Graves their Initial Grievance. HISD "missed" its written policy deadline by more than a year.

128.    By letter dated May 14, 2024, 5 days after the Board hearing, the HISD Board wrote:

> After careful consideration of all evidence, the board voted to deny the grievance and uphold the decision of the level 2 hearing officer.

EX. 10.

129.    The HISD's Board's "careful consideration" actually took fewer than 10 minutes of "deliberation." The Board's "deliberation" lasted fewer than 10 minutes.

130.    The result of the Board's "careful consideration" was its ratification and participation in—as HISD's policy maker--all HISD misconduct as set out in this Complaint, including practices that violated its own written policy,

131.    In its decision the Board ratified and did itself participate in and condone practices that conflicted with its own written policies, and the Constitution.

132.    This Board was deliberately indifferent to Constitutional violations and its own written policies.

133.    Plaintiffs' have alleged facts that support the claim that the Board's assertion of "careful consideration" is not simply a meaningless exaggeration, but a fabrication, like other, HISD fabrications, employed to suppress complaints about HISD.

## F. HISD'S GRIEVANCE PRACTICES ENABLE HISD TO TURN A DISPUTE RESOLUTION PROCESS INTO A TOOL USED TO SUPPRESS THE RIGHT TO EXPRESS CRITICISM OF THE DISTRICT

### 1. HISD did not evaluate the Bales' grievance: It attacked the Bales.

134.    March 1, 2023. Leslie Bales and her husband Bryan, as was their right, visited the Lamar HS campus to voice their concerns about the conduct of two HISD employees to a Principal or an Assistant Principal.

135.    The Bales had legitimate business at Lamar HS. They wished to voice concern and criticism about the harassment of their daughter by Acord and Davis.

136.    HISD chose not to listen to, evaluate, or engage in dialog with the Bales about their concerns.

137.    Instead, HISD mounted an immediate assault on the Bales' character that was based on a flawed investigation, unsupported conclusions, factoids, and falsehoods.

138.    HISD delayed the grievance process for more than a year, and repeatedly sought to defend the delay on the need to conduct a thorough investigation. During this delayed process HISD had a practical monopoly on information access. That monopoly continues and will continue until discovery in this case begins. Despite this, HISD has been unable to factually support the serious character attacks HISD made against the Bales.

139.    The Criminal Trespass Warning Notice signed by Graves relied on unreliable and false information, including this falsehood:

> Unfortunately, this is not the first occasion where your (Leslie Bales) encounters with Lamar High School administrators and staff came across as derogatory and hostile. For example, on several occasions our office staff reported aggressive behavior and a disruption to the school environment.

EX 3,

140.    Any falsehood is wrong, but this defamatory falsehood is particularly egregious. HISD had plenty of time to factually support this false accusation, but never did. Instead, it permitted Graves, who signed the Criminal Trespass Warning Notice, to serve as the Level 1 decision-maker on both the Initial Grievance and the Retaliation Grievance. HISD practices permitted Graves to pass judgment on the merit of her own challenged conduct.

141.    The Criminal Trespass Warning Notice falsely claimed that:

> Additionally, you (referring to Leslie Bales) refused to comply with campus visitor protocols, and returned to campus on Friday, parking in the visitor lot and walking across the lawn during lunch without registering as a campus visitor.

EX 3.

142.    Importantly, the Criminal Trespass Warning Notice was sent to Leslie Bales, a black woman, and not to her husband Bryan, a white male. Selective enforcement of an alleged HISD "protocol" based on race violates Leslie Bales' constitutional right to equal protection.

143.    While neither Leslie nor Bryan Bales "refused" to comply with HISD protocols when they did their weekly routine banking business at the bank located on the Lamar campus, the Criminal Trespass Warning Notice singles out Leslie as a rule-breaker, ignoring that Bryan was with her as he was every Friday. This fact further supports the racial animus that moved HISD to throw its proverbial rulebook at a black woman and not at a white male whose conduct was identical.

144.    Mischaracterizing the Bales routine banking business as a refusal to comply is objectively false.

145.    The "Friday" referred to in HISD's Criminal Trespass Warning Notice was March 3, 2023, the day after the Bales had met with Fernandez and Gillespie.

146.    The Criminal Trespass Warning Notice knowingly fabricated the claim that Leslie Bales, but not apparently Bryan Bales, "refused" to comply with campus protocols by simply walking with her husband to their bank that is located on the Lamar campus as they routinely did each Friday.

147.     Moreover, Bryan Bales informed Fernandez and Gillespie of their banking practice to ensure that their routine banking practice was acceptable, because the next day, a Friday, was their routine banking day.

148.    This objective falsehood is a fact that further supports HISD's violations of the Bales due process and Leslie Bales equal protection rights.  Leslie Bales and Bryan Bales walked together to the bank. Their conduct was identical. Yet HISD used this claim arbitrarily and selectively against only Leslie Bales.

149.    HISD has not and cannot Constitutionally justify this disparate treatment of identical conduct.

150.    The HISD Board formally ratified and participated in this disparate treatment in its Level 3 grievance decision.

151.    In connection with this baseless claim that Leslie's routine banking practice amounted to a "refusal" to comply with HISD protocol's, it is significant that HISD never

addressed the fact that both of the Bales complained that they were nearly runover by Davis' golf-cart as they were returning to their car. HISD produced nothing to indicate it bothered to investigate the Bales' complaints as it attempted to muster attacks on the Bales' character,

152.    HISD arbitrarily and selectively assembled and deemed as "true" "information that favored HISD and ignored facts that conflicted with and contradicted the information upon which HISD relied.

153.    The HISD Criminal Trespass Warning Notice, the HISD  Level I  decisions,  the HISD  Level 2 decision, and the Board's Level 3 decision are not supported with facts that withstand fair and objective scrutiny.

154.    The restriction of Leslie Bales', or any parent's, legitimate right to speak, or legitimate right to campus access by threat of serious criminal penalties, requires at least minimal due process—a minimum procedural guardrail of some sort, like the right to have an appeal heard by the Board within 90 days,  to ensure such punishment is not arbitrary or capricious or a pretext for stifling free speech, violating equal protection, and denying due process.  HISD did not meet this minimal bar, and instead bullied parents who wished to complain simply because it felt it had the raw power to do so.

155.    The HISD Criminal Trespass Warning Notice served on Leslie Bales was primarily based on generalized conclusions about inappropriate behavior.

156.    The HISD Level 2 decision relied exclusively on the factoid that Leslie Bales, while in the Welcome Center, acted improperly. The Bales have denied this pretext. At Level 2, they personally denied it again on the record. HISD' assigned grievance decisionmakers, including the Board gave no credence to this denial, and never mentioned it. Instead, at each level of the

grievance process, HISD recited, and accepted as true, every word of its flawed "investigation." This "investigation" was so obviously an exercise in developing "evidence" to support its predetermined intent to defend HISD conduct and assail the Bales that all reasonable minds should at least question the "investigations" motives and merit. The cherry-picked "facts," self-serving statements. unsupported conclusions, and blindness to conflicting facts so pervade the HISD "investigation" and its "decisions" that the deafening silence of the Board in its "carefully considered" Level 3 decision, that gave no rationale at all for its decision, are actual facts that directly support that the Board both ratified and was the moving force in HISD practices that violate the Constitution of the United States of America.

157.  Rather than listen to and address Bales' complaints and the facts supporting their grievances, the Board used, ratified and endorsed practices offensive to our Constitution.

158.   HISD controlled access to information as it delayed the grievance allegedly for the purpose of conducting a thorough investigation. This 'investigation" really amounts to several unsworn "witness statements" from selected HISD employees that HISD accepted, without question or challenge as complete and truthful.

159.   HISD is certainly entitled to consider the witness statements along with all other relevant materials. HISD, however, did not do that.

160.   Instead, HISD selectively and uncritically used portions of these "witness statements" to support its pre-determined conclusion to support all HISD conduct related to the complaints made against that conduct. HISD's intention as supported by facts alleged in this Complaint was to suppress speech critical of its conduct by demeaning the would-be speaker.

161.    The "witness statements," when fairly evaluated, simply do not support HISD's punishment of Leslie Bales. Rather, HISD's reliance on these statements' lays bare the fact that HISD's used pretext to silence criticism.

162.    The Level 2 "findings" were as follows":

In reading the seven witness statements, the behavior Mrs. Bales exhibited on March 1, 2023, at Lamar High School constituted a material disruption to the campus operations and compromised the safety and welfare of staff and students. Specifically, witness statements gathered in connection with the investigation recall Mrs. Bales shouting the following comments:

• "I need the damn principal or whoever is in charge of that racist bitch."
• "I hate that racist shit."
• "I can't stand racist Mexicans."
• "Yes, call all the help you need, all you do is accommodate the racism at this school."
• Upon the arrival of a campus police officer, Ms. Bales engaged in shouting and made outcries that campus administration had brought "guns and force to her".

It is my finding that Lamar High School Administrators complied with HISD Board Policy GKA (local) by requesting persons engaging in unacceptable conduct to leave the school grounds.

EX 9 at p 2.

163.    These "findings" invoke and accept as true selective portions of selected "witnesses," ignore all contradicting facts, and demean the reputation of parents who desire to exercise their right to free speech. The HISD attack on Leslie Bales chilled the exercise of free speech for the entire Bales family and many others who remain silent precisely because they know HISD has great power to inflict injury on critics over which they have control, like parents, students, and HISD employees.

164.    Moreover, HISD ignores facts that conflict with and contradict its "findings." HISD manipulates information to support its conduct and attack the Bales.

165.    HISD ignored the Bales repeated signed and transcribed statements that Leslie Bales does not use profanity and did not use profanity as "found" by HISD appointed grievance decision-makers.

166.    While Leslie Bales and Bryan Bales have documented for HISD their denials of the use of profanity, not one person testified to support HISD's "findings."

167.    HISD's access to information, of course, dwarfed the Bales access.

168.    HISD had access to all its employees and all its video and body-cam footage. Yet. HISD never presented a single witness at any grievance hearing to support any part of their attack on the Bales.

169.    Nor did HISD present any documentation to dispute Plaintiff's factual allegation that their grievances were ignored, and any HISD "investigation" focused on developing pretexts to viciously and groundlessly assail the Bales character.

170.    HISD relies on selections from those few employees it chose to provide "statements."

171.    The only HISD employees whose "statements" claim Leslie Bales used profanity are Antrice Axel [EX. 11[1] at 7]and Evelyn Polio [EX. 11 at 8]. Those two statements materially conflict with each other.

172.    Although Axel and Polio were within feet of each other when the Bales entered the Welcome Center March 1, 2023, Polio's undated statement does not support Axel's email claim

---

[1] EX 11 is a document prepared by HISD that purportedly represents the information HISD relied on at Level 1. Plaintiff has added page numbers to assist in identifying specific documents.]

that Leslie Bales said. "I need to speak to the principal or whoever is in charge of this "racist bitch." Polio's "statement" does not confirm this." Polio's statement makes no mention of this.

173.    Although Axel and Polio were within feet of each other, Polio's undated statement does not support Axel's email claim that Leslie Bales said, "I need the damn principal or whoever is charge" Polio's "statement" does not confirm this. Polio's "statement" makes no mention of this.

174.    Although Axel and Polio were within feet of each other, Polio's undated statement does not support Axel's email claim that Leslie Bales said, "yea [sic] call all the help you need; all you do is accommodate racism at this school!" Polio's "statement" does not confirm that this was said. It mentions nothing like that.

175.    Although Axel and Polio were within feet of each other, Polio's undated statement does not support Axel's email claim that Leslie Bales "exclaimed, 'I hate this racist shit she knows we came in together.'" Polio's "statement" does not confirm this. Polis "statement" claims that Leslie Bales said, "I hate this racist shit." As set out above, the Bales deny both versions. Instead, Leslie, speaking to Bryan and referring to Polio's actions, said, "That is racist." As with all the conflicts and contradictions among the HISD "statements," HISD ignored them, did not explore.

176.    Moreover, HISD decisionmakers and investigators never bothered to address the fact that Polio's intervention in the sign in process evidenced racial animus. Polio was never questioned by HISD about her conduct.

177.    HISD, similarly, did not even question Acord or Davis about their conduct that naturally led the Bales go to the school and voice their concerns. Davis was not asked a thing about his conduct.

34

178.    HISD's "investigation" was as a fact limited to its effort to discredit the Bales while avoiding investigating the Bales' claims.

179.    HISD with an inexplicable lack of basic curiosity, never followed up with Axel and Polio on any of the material conflicts in their statements.

180.    HISD did not ask Polio why she found it necessary to inject herself in the process of a couples signing in, and imply they were not, in fact, a couple.

181.    HISD did not ask Polio why in her statement she referred to Bryan, a white person, as a "gentleman," but characterized Leslie, a black person, as "talking" in a "negative manner and unpleasant tone of voice." While the term "politically correct" is frequently dismissed or derided, racial and cultural insensitivity is the tip of an iceberg of bias. At the very least, HISD's failure to investigate Polio's conduct as an employee working in a Welcome Center evidence HISD's failure to provide any diversity or conflict resolution training and supervision.

182.    Neither Axel nor Polio support The Criminal Trespass Warning Notice claim that Leslie Bales was "banging on the counter and yelling." The conflict between those statements and the allegations made by Graves, like all other such obvious instances of HISD conflicting stories, was not investigated.

183.    Moreover, not one of the other HISD "statements" accuse either of the Bales of using profanity or yelling in the Welcome Center or anywhere else.

184.    HISD employee Acord sent an email to Graves March 2, 2023, and it did not accuse the Bales of using profanity. EX 2 and EX. 11 at 6.

185.    HISD employee Ford claimed she arrived at the Welcome Center very soon after the Bales arrived, and gave a statements that does not accuse the Bales of using profanity. EX 11 at 9[2]

186.    HISD employee Will Wesley whose "statement" implies that he arrived at Welcome Center just after Ford and Walton arrived. Like Ford, Wesley's "statement" does not accuse the Bales of using profanity. EX. 11 at 10.

187.    HISD employee Fernandez' undated "statement" does not even discuss the March 1, 2023, events even though she was obviously present. Her statement does not claim that she heard the Bales use profanity or yell. EX. 11 at 11.

188.    Dennis Gillespie's "statement," does not claim the Bales of used profanity. EX. 11 at 12.

189.    Davis, who never gave a statement addressing his own misconduct, reportedly corroborates the use of profanity. This effort, however, diminishes HISD's credibility to a point that lacks any reliablity.

190.    No HISD officer produced body cam footage supporting HISD claims. The Professional Standards Department's report, however, falsely says that Davis said that he *and Dr. Acord* heard Ms. Bales screaming and using profanity at the front office clerks. Ex 7 at p. 8. If he did say that, he spoke untruthfully. First, the HISD video of time during which the Bales were accused of misconduct incontrovertibly shows Davis was not present at that time. The video is in the possession of HISD. Second, the same PSD report directly contradicts Davis by reporting that

---

[2] Although the signature on this "statement" is illegible, Plaintiff's review of all the statements permits the information and belief that this was is Ford's statement.

Acord said she could not go the Welcome Center on March 1 because she was on lunch duty, and she makes no reference at all to overhearing anything Davis allegedly describes. Ex. 7 at p. 6. Again, HISD's failure to offer any explanation for or acknowledgement of obvious material contradictions within its own investigatory documents is evidence of HISD's practice of using false reporting knowingly or with conscious indifference to violate rights protected by the Constitution—the right to speak, the right due process, and the right to equal protection under the law.

I. **HISD RETALIATED AGAINST THE STUDENT ETHAN BALES TO STIFLE HIS PARENT'S COMPLAINT ABOUT HISD CONDUCT**

191.    Acord without reason or explanation took a photograph of Ethan Bales after his parent's visited the Welcome Center to voice complaints about her conduct.

192.    Fewer than 3 school days after his parents filed their grievance, Ethan Bales, who had never been disciplined during his years at Lamar, was targeted for a dress code violation.

193.    Ethan, who was wearing black dress slacks, was told he was violating the dress code and forced to change into ill-fitting pants

194.    Lamer students routinely do not meet the so-called dress code and suffer no consequences.

195.    HISD's arbitrary and capricious enforcement of the so-called code demonstrates it is yet another powerful weapon in HISD's arsenal to suppress speech. As in Ethan's case, the code, as supported by the facts alleged in this Complaint, was used as a pretext to further intimidate the Bales, and discourage the voicing of their complaint. Ethan had no disciplinary action taken against him until 3 days after the Bales filed their initial grievance.

196.    Not satisfied with making Ethan spend a day wearing embarrassingly small pants, HISD went disturbingly further the next day.

197.    While Ethan was in a classroom, Riviera Colone dramatically pulled him out of his class and into the hallway where he began yelling at Ethan, in a voice that could be heard in Ethan's classroom and beyond.

198.    Riviera Colone falsely accused Ethan of stealing the small pants and threatened him with suspension.

199.    Fearing for his safety and concerned about where Riviera Colone's tirade may lead, Ethan called his mother who heard much of Riviera Colone's rant.

200.    The rant was also heard by Ethan's teacher who left the classroom out of concern about the commotion caused by Riviera Colone to see if Ethan was alright.

201.    In fact, Ethan had returned the pants the day before at the end of the school day. As no one was in the dressing area to take the pants, Ethan returned them to the 11th grade clerk. The notion that he stole the pants was easily confirmed nonsense.

202.    April 20, 2023, the Bales filed a grievance for retaliation against their son (the Retaliation Grievance.)

203.    HISD further retaliated against Ethan Bales by misstating his attendance record.

204.    HISD further retaliated against him when he and two friends returned from an off-campus lunch. Graves, who was seldom seen inside and certainly outside the school building, was awaiting his return, and immediately began to reprimand him. This must take into account that Lamar students frequently take an off-campus lunch without signing out and are not disciplined.

They certainly are not met by Graves. Graves' approach to Ethan was so aggressive that it caught the attention of another administrator who intervened,

205.    HISD further retaliated against Ethan Bales when Graves inserted herself in an ongoing class, sat next to Ethan, and began speaking to him while the classroom teacher was speaking to the class. When Ethan said, he really should not be speaking with her, Graves abruptly got up and criticized Ethan's "attitude." Graves' provocative interruption of Ethan's class work must also be viewed in the factual context that Graves seldom left her office, much less chatted up a student during class.

**J. HISD PRACTICES RATIFIED AND DIRECTLY PARTICIPATED IN BY THE HISD BOARD, THE DISTRICT'S ULTIMATE DECISION-MAKER, WERE THE MOVING FORCE IN THE VIOLATION OF THE BALES' CONSTITUTIONALLY PROTECTED RIGHTS.**

206.    HISD knowingly permitted fabricated claims and non-fact supported conclusions to justify the Criminal Trespass Warning Notice it sent to Leslie Bales. The HISD Board ratified and participated in this practice when it blanket denied the Bales' Initial Grievance and ignored the Retaliation Grievance altogether.

207.    The HISD Board's  knowing decision to condone all HISD conduct toward the Bales, including delaying the Bales's appearance before the Board for more than one year in excess of its own  written policy, puts in proper factual perspective HISD multiple efforts  to prevent the Bales' from voicing a complaint about HISD employees and to punish them and their son for pursuing their right to voice their complaints and have them heard and fairly evaluated.

208.    The HISD Board's failure to even address HISD practices that clearly violated its own written policy is a fact that HISD cannot truthfully controvert, and a fact that evidence that

the Board participated in, ratified, and was the moving force in HISD's violation of the Bales' Constitutionally protected rights. .

209.    The HISD Board's Level 3 grievance process decision factually confirms it was the moving force in the violation of the Bales' constitutionally protected rights. With this decision that was entered after so-called "careful consideration," the HISD Board formally approved and ratified, without question or exception, all HISD practices that violated Bales. Constitutional rights and that were unconstitutionally employed to wrongly whitewash HISD misconduct and demonize the Bales throughout the grievance process.

220.    The Board stamped "APPROVED" as the final and ultimate decision-maker on the HISD practices that violated the United States Constitution.

211.    Not one Board member asked a single question or made a single comment about anything during the Board hearing.

212.    The Board, which presumably had not previously discussed the Bales two grievances before the hearing, which would have violated the open meetings requirements, spent fewer than 10 minutes in "deliberation" before unanimously ratifying all HISD conduct. The Board's message was clear:  Complain about HISD at your own peril.

213.    HISD practices as alleged in this Complaint suppress speech intentionally or as a result of deliberate indifference. HISD practices, as alleged, ignored the Bales complaints, attacked the Bales, and affirmatively escalated conflict rather than take any measure designed to resolve conflict.

214.    In achieving that objective, the HISD Board condoned the multiple failures of HISD to provide any training and supervision of  its employees about areas as fundamental as customer

service, sensitivity to the diversity of the HISD community, complaint investigation, and dispute resolution.

### III. CAUSES OF ACTION

**Claim 1**
**Section 1983: First Amendment – Viewpoint/Content Discrimination**
**Claim against both Graves and HISD**

215.    Leslie and Bryan Bales repeat and re-allege all preceding paragraphs.

216.    The First Amendment forbids government actors from restricting people's speech based on viewpoint or content. The First Amendment applies to state actors through the Fourteenth Amendment's incorporation doctrine.

217.    It is impermissible viewpoint discrimination to prohibit speech when the rationale for the restriction is a speaker's perspective or opinion.

218.     It is impermissible content discrimination when the government regulates speech based on the topic it belongs to, or the substance of message conveyed.

219.     Graves, acting under the color of law, and HISD suppressed Leslie and Bryan Bales' First Amendment rights to free speech by issuing a Criminal Trespass Warning Notice to Leslie Bales. Though the Criminal Trespass Warning Notice was, in violation of the Fourteenth Amendment's equal protection clause, issued only to the black woman Leslie Bales, it chilled the same free speech rights of her white husband Bryan Bales. Graves and HISD based the Criminal Trespass Warning Notice on knowingly false accusations, including, but not limited to, the false allegations that Leslie Bales had a history disruptive conduct on the Lamar campus. HISD practices, including its Grievance Procedure practices, were the moving force in this constitutional violation as evidenced by, among other facts alleged in this Complaint, the unequivocal Board ratification of all practices complained of by the Bales as set out in this Complaint, including the

misuse of grievance process, to stifle the Bales free speech rights. The Board is HISD's primary policy maker.

220.    As factually alleged in this Complaint, the Board knowingly ratified and participated in practices that unconstitutionally violated the speech rights of Leslie Bales and unconstitutionally chilled the speech rights of Bryan Bales and all other parents who wish to express disagreement with HISD conduct.

221.    HISD has a public record of repeated efforts to suppress speech critical of it, including the trespass arrests of persons protesting at public Board meetings or other lawful gatherings, and Superintendent Miles' repeated characterization of HISD critics as "disgruntled" or not "team players" or "opponents."

222.    Specifically, Miles has publicly said that his "wholesale systemic change" is unquestionably necessary and correct and those who disagree have the choice of accepting his views or suffering adverse consequences.

223.    Graves and HISD suppressed protected conduct.

224.    The HISD Board approval and participation in practices that employ the grievance process as a tool to attack and demean those who seek to voice criticism of HISD, a protected right, imperils past, present, and future protected speech critical of HISD.

225.     It is impermissible viewpoint discrimination to prohibit speech when the rationale for the restriction is a speaker's perspective or opinion.

226.     It is impermissible content discrimination when the government regulates speech based on the topic it belongs to, or the substance of message conveyed.

227.    Graves' and HISD's misuse of the Bales's constitutional right to speak out against race-based insults to support the issuance of the Criminal Trespass Warning Notice to Lelie Bales

is a notable and inexcusable violation of the First Amendment's protection of free speech.  It is particularly shocking that a school principal and the Board of a public educational organization would misuse the right to speak out against pervasive race-based comments and actions as a pretext to limit a parent's right to campus access.

228.    Similarly, punishing Leslie Bales for expressing her opinion to her husband that racist conduct is not limited to white persons but can infect persons of all races and ethnicities is impermissible viewpoint discrimination, and casts an unconstitutional chill on the free speech of Leslie and Bryan Bales and others who share the experience of these comments.

229.    The Criminal Trespass Warning Notice denied Leslie Bales the right to liberty without due process. It violated her constitutional right to freedom from arbitrary and unreasonable restraint.

230.    "[R]refusing entry" is the only provision that could arguably support a Criminal Trespass Warning Notice "under the Board Policy quoted in the notice itself, and "refusing entry" does not support the notice issued to Leslie Bales because she had legitimate business to enter the school. She and her husband visited the school to voice a complaint about HISD employee conduct.

231.    In practice, HISD incorrectly attempts to support a Criminal Trespass Warning Notice *not* on the "refusing entry" provision, but on the provision that applies to a request that a person "leave school grounds." Using this improper provision, HISD attempts to justify the Criminal Trespass Warning Notice on pretextual and unsupported claims that, while in the school for legitimate business, Leslie Bales's supposedly misbehaved.

232.    HISD unconstitutionally prevented, restricted, and chilled Leslie Bales and Bryan Bales protected rights to freedom of speech and expression by using the Criminal Trespass Warning Notice and its Grievance Procedures as tools to abridge a parent's right to voice

complaints about HISD conduct. The Criminal Trespass Warning Notice issued Leslie Bales was a pretext to discourage her from voicing her complaints about HISD. The Grievance Process was employed to further silence her by the monetary and emotional cost of delay, and to demean her, her husband, her daughter, and her son at each stage of process. The grievance practices intentionally or through deliberate indifference, ignored the Bales' complaints, and accepted as truths the increasingly insulting claims made by HISD about Leslie Bales.

233.    The constitutional violations visited on Leslie Bales by the Criminal Trespass Warning Notice and HISD's grievance practices also chilled the freedom of speech and expression rights of Bryan Bales.

234.    Bryan Bales was a witness to the conduct of his wife while on the Lamar High School campus, and his conduct was not materially different from his wife's. He, therefore, knew after his wife's receipt of the Criminal Trespass Warning Notice that each time he dared enter the Welcome Center to complain about or question HISD conduct, he, and every other person with a complaint or question to voice, was in imminent danger of receiving a Criminal Trespass Warning Notice or an actual arrest based on the pretext. The Criminal Trespass Warning Notice issued Leslie Bales was intended to and did chill his right to speak, his son's right to speak, his daughter's right to speak. and right to speak of every person who wishes to complain about or question HISD conduct.

235.    The Bales' daughters never again dared exercise their right to take their brother to lunch or go near the campus fearing reprisals based on pretext.

236.    Bryan Bales never again felt free to exercise his right to visit the campus or do his banking business fearing reprisals based on pretext. His campus visits were limited to those absolutely needed to protect his student son from retaliation.

237.    Leslie Bales, even after the lengthy Criminal Trespass Warning Notice period expired, never felt free to exercise her right to visit the campus or walk with her husband to their bank that was located on campus fearing reprisals based on pretext.

238.    The HISD Criminal Trespass Warning Notice successfully discouraged voicing complaints and raising questions about HISD conduct. This type of "success," however, is precisely what the rights guaranteed by the Constitution are intended to prevent. HISD used unconstitutional means to reach unconstitutional ends.

239. These Constitutional violations caused emotional and economic damages to the Bales.

**Claim 2**
**Section 1983: Fourteenth Amendment – Equal Protection Violation-Race Discrimination Claim against both Graves and HISD**

240.    Leslie and Bryan Bales repeat and re-allege all preceding paragraphs.

241.    Graves, acting under the color of law, and HISD issued the Criminal Trespass Warning Notice to Leslie Bales only.

242.    The conduct of Leslie Bales and Bryan Bales when visiting Lamar HS was not distinguishable.

243.    Throughout the grievance process, HISD repeatedly used the pronoun "they" when describing the Bales' alleged behavioral misconduct, making no distinction between the conduct of Leslie and Bryan Bales.

244.    HISD's Criminal Trespass Warning Notice, however, targeted only Leslie Bales, a black woman, and not her husband, a white man. HISD has no rational explanation for this selective punishment and makes no attempt to defend this disparate treatment.  HISD unreasonably and arbitrarily punished a black individual for alleged conduct that did not differ from the conduct of the white individual who was not subjected to the same punishment. Of course, neither of the Bales should have received such a notice.

245.    Moreover, other facts set out in this Complaint, evidence HISD's racial animus toward Leslie Bales, a black woman, and both of the Bales because they are a mixed-race couple.

246. HISD practices were the moving force in this constitutional violation as evidenced by, among other facts alleged in this Complaint, the unequivocal Board ratification of these practices. The Board is HISD's primary policy maker.

247. HISD intentionally or with deliberate indifference, not only ratified, but participated in, the racially disparate issuance of the Criminal Trespass Warning Notice to Leslie Bales and the misuse of HISD Grievance practices to further demean and inflict emotional and monetary costs on the Bales to deter them from vindicating the violation of their rights to equal protection.

248. Leslie Bales only was sent the notice. This was so though her conduct did not materially differ from Bryan's. By way of example, a pretext used by Graves and HISD to justify the notice was that both of them walked together on the same sidewalk to access their bank located on the Lamar campus. Yet, the notice was sent only to Leslie Bales.

249. Graves and the Board intentionally or through deliberate indifference misused HISD Grievance practices to ignore the Bales' complaints and accepted as absolute truths the increasingly insulting claims made by HISD about Leslie Bales.

250. These Constitutional violations caused emotional and economic damages to the Bales.

**Claim 3**
**Section 1983: Fourteenth Amendment—Due Process Violation**
**Claim against both Graves and HISD**

251.    Leslie and Bryan Bales repeat and re-allege all preceding paragraphs.

252.    The Criminal Trespass Warning Notice issued by Graves and HISD, under color of law, to deny Leslie Bales right to liberty without due process. It violated her constitutional right to freedom from arbitrary and unreasonable restraint. For reasons explained, it also deprived Bryan Bales of those same rights though he was not the target of the notice. HISD ratified and participated in these constitutional violations and was in law and fact the moving force in these violations

253.    "[R]refusing entry" is the only provision of HISD written policy that could arguably support a Criminal Trespass Warning Notice "under the Board Policy quoted in the notice itself, and "refusing entry" does not support the notice issued to Leslie Bales. That provision is limited to persons who have no legitimate business to enter the school. Leslie Bales had legitimate business to enter the school. She and her husband visited the school to voice a complaint about HISD employee conduct.

254.    In practice, HISD based Leslie Bales Criminal Trespass Warning Notice on a provision that could not authorize such a notice; the provision that applies to a request that a person "leave school grounds." The Criminal Trespass Warning Notice issued to Leslie Bales, therefore, was unlawful. She like any parent or person with legitimate business to enter the school could not be refused entry.

255. The Criminal Trespass Warning Notice issued Leslie Bales by Graves and HISD and the HISD Grievance practices were used by Graves and HISD to silence the Bales' complaints with the monetary and emotional cost of delay, and the demeaning of Leslie Bales, her husband,

her daughter, and her son  at each stage of grievance process. The grievance practices intentionally or through  deliberate indifference, ignored the Bales complaints, accepted as truths, even when obviously false or highly suspect,  the increasingly personal and insulting HISD claims about the Bales.

256.    The Criminal Trespass Warning Notice instructed Leslie Bales that: "If you come on this campus, it will be considered trespassing under Texas education code section 37.107 and Texas Penal Code Section 30.05. . . ."

257.    This HISD practice exposed Leslie Bales, a parent, to criminal charges with penalties of $2000, jailing for 180 days, or both if she set foot on her son's campus.

258.    Making this threat even more imminent, the Criminal Trespass Warning Notice issued by Graves pursuant to HISD practice said, "Your failure to abide by the terms of this notice may result in you being arrested and charged with trespass on school grounds and/or criminal trespass. Please adhere to these expectations explicitly without exception."

259.    At the time the Criminal Trespass Warning Notice was issued and in the many months HISD had to craft its attack on the Bales, HISD has never  been able to muster up facts that support its attack on the Bales behavior that withstand even casual scrutiny much less the thorough  "investigation" HISD falsely claims it made.

260.    HISD claimed factual support for its allegations by attacking the Bales for "disruptive and  unprofessional behavior" fall into two categories (1) claims that are outright fabrications, and (2)  disputed claims that do not withstand even superficial scrutiny much less the "careful  consideration"  HISD falsely asserts it gave to the attacks visited on the Bales.

261.    These Constitutional violations caused emotional and economic damages to the Bales.

## Claim 4

### Section 1983: First Amendment and Fourteenth Amendment—Retaliation Claim against both Graves and HISD

262.    Leslie and Bryan Bales repeat and re-allege all preceding paragraphs.

263.    Graves, acting under the color of law, and HISD as alleged in Complaint retaliated against the Bales' son for the attempts to exercise their First Amendment right to voice complaints about HISD conduct.

264.    As described, Ethan Bales had never been subject to discipline until his parents sought to complain about the treatment of their daughter Maegan by HISD employees. As alleged, Ethan was targeted with multiple disciplinary actions and threats, starting immediately after his parents sought to complain about Maegan's treatment.

265.    All Ethan's alleged "infractions" were related to "rules" that were seldom enforced, and always selectively enforced. As Graves, herself, was directly involved in making or supporting allegations about Ethan's alleged infractions and all occurred after the Bales sought to voice their complaint, that these actions were taken in retaliation to his parents' grievance complaints is the inference that must be drawn at the pleading stage,

266.    Moreover, the treatment given to these retaliation claims during HISD grievance process further evidence that the discipline Ethan was exposed to be a part of Graves' and HISD's effort to silence the Bales. Importantly, the Level 2 decision did not even address the retaliation claim. Worse, the Board did not address this Level 2 failure in its decision.

267.    Again, the Board—HISD's policy maker—ratified and participated in this obvious breach of its own written policies. Intentionally or as a result of deliberate indifference the Board was the moving force in the constitutionally impermissible use of retaliation to deprive the Bales' constitutional right to voice their complaints using a grievance process that the Board in theory, but not in practice, held out as a fair forum for conflict resolution. This unconstitutional retaliation caused the Bales to suffer emotional and economic injury.

## JURY DEMAND

268.    Leslie Bales and Bryan Bales demand, as is their right, that all claims asserted in this case be resolved by a jury of their peers,

## PRAYER FOR RELIEF

269.    For the violations of their First and Fourteenth Amendment rights to free speech and free expression, equal protection under the law, and due process. The Bales request:

        a. An award of compensatory and punitive money damages against all Defendants for the injuries the Bales suffered due to Defendants' violations of their constitutional rights;

        b. An award of $1 in nominal damages based on Defendants' violations of their constitutional rights;

        e. A judgment declaring that Defendants practices that discourage a parent from making a complaint about HISD violates the First and Fourteenth Amendments;

        f. An order permanently enjoining Defendant from using policies, procedures, processes, and practices to discourage a parent from making a complaint about HISD:

        g. An award of reasonable attorneys' fees and costs; and

        h. Such other relief that this Court deems appropriate.

Respectfully submitted,

**JACK E. URQUHART**
**ATTORNEY AT LAW**

***/s/ Jack E. Urquhart***
State Bar No. 20415600
1302 Waugh Drive, No. 880
Houston, Texas 77019
832-723-2201
jack.urquhart47@gmail.com

ATTORNEY FOR PLAINTIFFS